IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 06-377-4 |
| ANTOINE NORMAN | : | |

**SURRICK, J.**                                                        **MARCH 14, 2008**

<u>**MEMORANDUM & ORDER**</u>

Presently before the Court is Defendant Antoine Norman's Motion for a Judgment of

Acquittal Pursuant to Rule 29(c)(1) (Doc. No. 194).  For the following reasons, Defendant's

Motion will be denied.

## I.      BACKGROUND

On July 26, 2006, the grand jury returned an indictment charging Defendant Antoine

Norman (hereinafter "Defendant") with conspiracy to commit bank fraud and identity theft in

violation of 18 U.S.C. § 371 (Count 1); bank fraud in violation of 18 U.S.C. § 1344 (Counts 2

through 5); aggravated identity theft in violation of 18 U.S.C. § 1028A (Counts 6 through 8, 11,

13, 16 through 22); and aiding and abetting under 18 U.S.C. § 2.  (Doc. No. 1.)  On September 7,

2007, the jury returned a verdict of guilty against Defendant on all Counts.  Defendant now seeks

relief pursuant to Federal Rule of Criminal Procedure 29(c), asserting that the evidence presented

by the Government at trial was not sufficient to support the guilty verdict on Counts 6, 7, 8, and

13.[1]

---

[1]  Defendant does not seek relief from the jury's findings of guilty on Counts 1, 2, 3, 4, 5,
11, 16, 17, 18, 19, 20, 21, and 22.

II.     **LEGAL STANDARD**

Federal Rule of Criminal Procedure 29(a) provides, in pertinent part: "The court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  The "sole foundation upon which a judgment of acquittal should be based is a successful challenge to the sufficiency of the government's evidence." *United States v. Frumento*, 426 F. Supp. 797, 802 n.5 (E.D. Pa. 1976), *quoted in United States v. Carter*, 966 F. Supp. 336, 340 (E.D. Pa. 1997); *see also* 2A Charles Alan Wright, *Federal Practice and Procedure* § 466 (3d ed. 2000) ("There is only one ground for a motion for a judgment of acquittal.  This is that the evidence is insufficient to sustain a conviction of one or more of the offenses charged in the indictment or information.") (internal quotation marks omitted).

In considering a post-verdict motion for judgment of acquittal under Rule 29, we must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The evidence must be examined as a whole in the light most favorable to the jury verdict, with the presumption that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences.  *See United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992).  Moreover, the verdict of the jury must be upheld unless, viewing the evidence in this fashion, no rational jury could have found the defendant guilty beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319; *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984); *see also United States v. Stratton*, No. Crim. A. 99-326, 2000 WL 892840, at *3 (E.D. Pa. July 6, 2000) (quoting *United States v. Coleman,* 811

2

F.2d 804, 807 (3d Cir. 1987) (finding that a court must sustain the verdict unless "'no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.'") (citation omitted)).  "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt."  *United States v. Pungitore*, 910 F.2d 1084, 1129 (3d Cir. 1990).

## III.   LEGAL ANALYSIS

Defendant moves for a judgment of acquittal on Counts 6, 7, 8, and 13.  (Doc. No. 194 ¶¶ 1-4, 7.)  These Counts charge Defendant and others with aggravated identity theft on various days and against various individuals.  (*See* Doc. No. 1.)  Defendant contends that since he was not in Philadelphia between November 2004 and February 2005, and did not commit any overt acts during that time, he cannot be guilty of the crimes charged in Count 13 which were committed in February 2005.  Defendant also contends that because the evidence failed to establish that he was present when the crimes in Counts 6, 7 and 8 were committed, he cannot be found guilty on these Counts.  (Doc. No. 194, Letter Mem.)  The Government responds that Defendant was convicted of conspiracy to commit bank fraud and identity theft, and therefore is liable for the crimes charged in Counts 6, 7, 8, and 13 which were committed by co-conspirators in furtherance of the conspiracy and could have been reasonably foreseen by Defendant.  (Doc. No. 200 at 2.)  The government is correct.

At trial, the parties did, in fact, offer a "[s]tipulation between the Government and Mr. Norman that Mr. Norman was not in Philadelphia from November 19th, 2004 until February 9th, 2005 and the indictment does not allege that he personally committed any overt acts during this time period." (Trial Tr. 9/4/07 at 54.)  However, the Government also presented overwhelming

evidence of Defendant's involvement in an identity theft conspiracy.  A brief review of evidence and testimony presented at trial demonstrates the frivolousness of Defendant's argument.

Co-defendant Kelly Taylor, a runner who cashed checks for the group, identified Defendant as one of the individuals involved in the scheme to defraud banks and commit identity theft.  (Trial Tr. 8/29/07 at 153, 160, 162.)  Taylor entered into a cooperation plea agreement with the government and testified against her co-defendants.  Taylor testified that Defendant Norman accompanied her approximately seventy-five percent of the time when she went to the bank to cash fraudulent checks.  (*Id*. at 175.)  Taylor would drive one car to the bank and Defendant would drive another car.  Sometimes Defendant would endorse the fraudulent checks. (*Id*.)  In addition, either Defendant or co-defendant Charles White would give her a "cheat sheet," which contained information that allowed her when cashing the fraudulent check to answer correctly any security questions posed by the bank teller.  (*Id*. at 176.)  Defendant White or Taylor would get this information by calling the 800-number for Commerce Bank.  (*Id*. 218.) Taylor would give the cash that she received from cashing the fraudulent checks to White or to Defendant.  (*Id*. at 177-78.)  Taylor estimated that during her career with this group she cashed approximately $500,000 to $1 million worth of fraudulent checks.  (*Id*. at 174.)

From cell phone records Taylor identified two telephone numbers associated with the bank fraud scheme.  (Gov't Ex. 17.)  The numbers belong to White and Defendant.  (*Id*. at 192-93.)  She also identified a picture of herself actually cashing a fraudulent check while she was talking on the phone to either White or Defendant.  (*Id*. at 195-96.)

Taylor further testified that she introduced "Karen" – Inspector Yvette Thomas of the United States Postal Inspection Service – to White and Defendant after being approached about

4

cooperating in the federal investigation.  (*Id.* at 235.)

Cooperating co-conspirator Terry Hughes testified that he met Defendant and Charles White when he came to Philadelphia in February 2004.  (Trial Tr. 8/28/07 at 244-45.)  Defendant and White introduced Hughes to Kelly Taylor, who taught Hughes how to  cash fraudulent checks.  (*Id.* at 245-47.)  During a practice run, Taylor demonstrated the check-cashing procedure for Hughes by driving him to Commerce Bank and cashing a check.  (*Id.* at 247.)  The two subsequently drove back to the location where Defendant and White were waiting and gave them the proceeds from the check.  (*Id.*)  A couple of days later, White and Defendant took Hughes on a "run," which involved cashing checks at multiple banks.  (*Id.* at 248.)  Defendant and White gave Hughes the checks to cash.  (*Id.* at 248-49.)  They also gave him a "cheat sheet." (*Id.* at 250-51.)  Hughes picked up a car and Defendant and White followed Hughes to the banks to make sure that Hughes did not abscond with the money.  (*Id.* at 249.)  Hughes successfully cashed the first check and gave the cash to White, who was in a car with Defendant near to the bank.  (*Id.* at 251.)  Subsequent transactions proceeded in the following manner: (1) White would give Hughes a check, (2) Hughes would follow White and Defendant in their car to the next bank, (3) White and Defendant would drive to a position away from the bank, (4) Hughes would cash the fraudulent check, and (5) Hughes would give the cash to White and receive the next check.  (*Id.* at 252-53.)  Hughes testified that neither Defendant nor White ever went through the drive-through with Hughes.  (*Id.* at 259.)  Hughes went on drive-through check-cashing expeditions about two or three times a week for approximately two months.  (*Id.* at 257.) Hughes also went on "runs" with other individuals.  (Trial Tr. 8/29/07 at 67.)  He always  gave the proceeds from the checks to White.  (Trial Tr. 8/28/07 at 258.)  Hughes estimated that

Defendant was present when he cashed fraudulent checks about ten-percent of the time. (*Id*. at 257.)

Hughes testified that he took approximately $50,000 out of the accounts of other people through his fraudulent check-cashing. (*Id*. at 277-78.) From this amount, Hughes kept five-percent and the rest went to White, Defendant, and others. (*Id*. at 278.)

Co-defendant Kevin Norris was an active participant in the bank fraud and identity theft ring. Norris entered into a plea agreement with the government and testified against his co-defendants. Norris testified that Defendant would sometimes accompany him when he went to banks to cash fraudulent checks. (Trial Tr. 8/30/07 at 196.) Norris identified Defendant at trial and testified that on the way to the banks, he saw the ringleader Charles White and Defendant pass the fraudulent checks back and forth to each other. (*Id*. at 198-99.) In addition, Norris testified that on occasion he would accompany other runners to banks when they cashed fraudulent checks. Norris also testified concerning his contacts with other members of the conspiracy.

Co-defendant Lisa Smith, another cooperating co-conspirator, testified that she was recruited to cash checks for the group. (Trial Tr. 8/28/07 at 45-46.) When Smith went to the bank to cash the fraudulent checks, Defendant and White would generally accompany her. (*Id*. at 49, 57, 68.) Similarly, Defendant was usually present when White gave Smith false identification and fraudulent checks to cash. (*Id*. at 68.)

United States Postal Inspector Yvette Thomas testified that she went undercover to assist in the federal investigation of this bank fraud and identity theft ring. (Trial Tr. 8/30/07 at 250.) Thomas posed as "Karen" and was introduced to the group by check runner Kelly Taylor. (*Id*. at

252.)  Inspector Thomas testified that while pretending to participate in the scheme, she met

Defendant and observed him assisting Kelly Taylor in cashing fraudulent checks.  (*Id*. at 258.)

For example, she saw him preparing a "cheat sheet" for Taylor to use (*id*. at 258-59) and

endorsing fraudulent checks (*id*. at 261).  On the day that she assisted in cashing checks,

Inspector Thomas watched Defendant count the fraudulently obtained cash and distribute it to

the members of the conspiracy who were present.  (*Id*. at 270.)

United States Postal Inspector Khary Freeland testified that he analyzed the cell phone

records of the various members of the conspiracy and identified the telephone number used by

Defendant.  (Trial Tr. 9/4/07 at 85-86.)  Inspector Freeland identified 909 calls between

Defendant and White during the time period of February 2005 to July 2005.  (*Id*. at 94.)  There

were also five calls between Defendant and co-defendant Akintunde Crawford; ninety-one calls

between Defendant and co-defendant Michael Merrin from February to September 2005; and

ninety-nine calls between Defendant and co-defendant Allen Smith from February to August

2005.  (*Id*. at 94-95.)  In addition, there were two calls from Defendant to PNC Bank from April

to May 2005; forty-eight calls from Defendant to Wachovia Bank from March to July 2005;

seven calls from Defendant to M&T Bank in May 2005; and fifty-one calls from Defendant to

Commerce Bank from February to September 2005.  (*Id*.)  Defendant did not have bank accounts

at any of these banks.  (*See* Trial Tr. 8/27/07 at 93 (Commerce Bank); Trial Tr. 8/28/07 at 156

(Wachovia Bank); Trial Tr. 8/28/07 at 177 (PNC Bank); 8/30/07 at 160 (M&T Bank).)  On April

12, 2005, for example, Defendant called Commerce Bank to access Donna Carey's bank account

information.  (Trial Tr. 9/4/07 at 102; Gov't Ex. 158.)  A PIN number was entered, an account

number was entered, the deposit menu appeared to be accessed, and the last deposit appeared to

be accessed.  (*Id*.)  This call was made by Defendant when Inspector Thomas was undercover posing as the runner named "Karen."  (*Id*. at 120.)  On that day, Defendant endorsed five blank checks with Donna Carey's name, Charles White filled out the front of the checks, and the checks were then given to Kelly Taylor.  (Trial Tr. 8/30/07 at 261-62.)  Taylor and Inspector Thomas cashed four of these checks.[2]  (*Id*. at 267.)  The fifth check was deposited.  (*Id*.)  Taylor and Inspector Thomas then met up with Defendant and White and handed over the cash.  (*Id*. at 270.)

Based upon all of the evidence, the jury found Defendant guilty of conspiracy to commit bank fraud and identity theft.  The evidence established that Defendant communicated extensively with various members of the conspiracy.  Defendant contacted multiple banks, on multiple occasions, in order to acquire information about identity theft victims.  Defendant recruited runners to cash checks and assisted in training them.  Defendant, with co-defendant White, accompanied the check cashing co-conspirators to banks and received the proceeds from their illegal activities.  Defendant was active in furthering the conspiracy's common goal of committing bank fraud and identity theft on a continuing basis.  All of the members of the conspiracy worked together to have fraudulent checks cashed by banks with the profits being distributed to the conspirators.  We are satisfied that the Government demonstrated beyond a reasonable doubt that Defendant was a member of this identity theft conspiracy.

"[A] jury must find that a party to the conspiracy committed a crime both 'in furtherance of' *and* 'as a foreseeable consequence of' the conspiracy to find a co-conspirator guilty of a

---

[2] Inspector Freeland had alerted the banks as to what was happening prior to Inspector Thomas ("Karen") appearing at the banks to cash the checks.  (Trial Tr. 8/30/07 at 265.)

substantive offense committed by a co-conspirator."[3] *United States v. Turcks*, 41 F.3d 893, 897

(3d Cir. 1994) (citing *Pinkerton v. United States*, 328 U.S. 640, 646 (1946); *United States v.*

*Gonzalez*, 918 F.2d 1129, 1135 (3d Cir. 1990)).  The offenses charged in Counts 6, 7, 8, and 13

were offenses committed in furtherance of the conspiracy and they were a foreseeable

---

[3] The jury was charged on *Pinkerton* liability as follows:

[C]ounts Two through 22 of the indictment charge that certain defendants committed bank fraud and aggravated identity theft.  The government may prove a defendant guilty of these offenses by proving that a defendant personally committed the offenses.  The government may also prove a defendant guilty of these offenses based on the legal rule that each member of a conspiracy is responsible for crimes and other acts committed by the other members of the conspiracy as long as those crimes and acts were committed to help further or achieve the object or the objectives of the conspiracy, and were reasonably foreseeable to the defendant as a necessary and natural consequence of the agreement.  In other words, ladies and gentlemen, under certain circumstances, the act of one conspirator may be treated as the act of all.  This means that all the conspirators may be convicted of a crime committed by any one or more of them, even though they did not all personally participate in that crime themselves.

In order to find a defendant guilty of bank fraud or aggravated identity theft, based upon this legal rule, ladies and gentlemen, you must find that the government has proven beyond a reasonable doubt, each of the following four requirements.  First, that the defendant was a member of the conspiracy charged in the indictment.  Second, that while the defendant was still a member of the conspiracy, one or more of the other members of the conspiracy committed the offenses charged in Counts Two through 22, by committing each of the elements of those offenses, as I have described those elements in these instructions.  However, the other members of the conspiracy need not have been found guilty or even charged with the offenses, as long as you find that the government has established beyond a reasonable doubt that the other members committed the offenses.  Third, that the other members of the conspiracy committed these offenses within the scope of the lawful – of the unlawful agreement and to help further the objectives and to achieve the objectives of the conspiracy.  And fourth, that these offenses were reasonably foreseeable to a reasonable – and to reasonably be anticipated by the defendant as a necessary or natural consequence of the unlawful agreement.

Ladies and gentlemen, the government does not have to prove that the defendant – that a defendant specifically agreed to or knew that these offenses would be committed.  However, the government must prove that the offenses were reasonably foreseeable to the defendant, as a member of the conspiracy, and within the scope of the agreement as the defendant understood it.

(Trial Tr. 9/5/08 at 185-87.)

consequence of the conspiracy.  The fact that Defendant was out of town or was not present when these offenses were committed is of no consequence.  As a participant in the conspiracy, Defendant is liable for the substantive offenses charged in these Counts and committed by other members of the conspiracy.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 06-377 |
| ANTOINE NORMAN | : | |

**<u>ORDER</u>**

AND NOW, this <u>14th</u> day of March, 2008, upon consideration of Defendant Antoine

Norman's Motion for a Judgment of Acquittal Pursuant to Rule 29(c)(1) (Doc. No. 194), and all

papers submitted in support thereof and in opposition thereto, it is ORDERED that the Motion is

DENIED.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, Judge